RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0256p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

HOPKINS COUNTY COAL, LLC,

*Petitioner,*

*v.*

No. 16-3848

ALEX ACOSTA, Secretary of Labor, MINE SAFETY AND
HEALTH ADMINISTRATION; FEDERAL MINE SAFETY
AND HEALTH REVIEW COMMISSION,

*Respondents.*

─────────────

On Petition for Review from the Federal Mine Safety and Health Administration.
Nos. 2009-820; 2009-821; 2009-822; 2009-1441.

Argued: March 15, 2017

Decided and Filed: July 18, 2017[*]

Before: KEITH, ROGERS, and KETHLEDGE, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Melanie J. Kilpatrick, RAJKOVICH WILLIAMS KILPATRICK & TRUE, PLLC,
Lexington, Kentucky, for Petitioner. Philip Mayor, UNITED STATES DEPARTMENT OF
LABOR, Arlington, Virginia, for Respondent Secretary of Labor. **ON BRIEF:** Melanie J.
Kilpatrick, Marco M. Rajkovich, Jr., RAJKOVICH WILLIAMS KILPATRICK & TRUE,
PLLC, Lexington, Kentucky, Gary D. McCollum, HOPKINS COUNTY COAL, LLC,
Lexington, Kentucky, for Petitioner. Philip Mayor, W. Christian Schumann, UNITED STATES
DEPARTMENT OF LABOR, Arlington, Virginia, for Respondent Secretary of Labor.

KEITH, J., delivered the opinion of the court in which ROGERS, J., joined.
KETHLEDGE, J. (pg. 21), delivered a separate dissenting opinion.

─────────────

[*]This decision was originally filed as an unpublished opinion on July 18, 2017. The court has now
designated the opinion for full-text publication.

_____

**OPINION**

_____

DAMON J. KEITH, Circuit Judge.   This appeal involves the scope of the Secretary of Labor's ("Secretary") power to access company documents during investigations of discrimination complaints under the Federal Mine Safety and Health Act of 1977 ("Mine Act"). An employee of Hopkins County Coal ("HCC"), Robert Gatlin ("Gatlin"), filed a discrimination complaint with the Department of Labor's Mine Safety and Health Administration ("MSHA"). After forwarding the discrimination complaint to HCC and making an initial request to interview HCC managerial employees, the MSHA sent a letter to HCC requesting to review five sets of documents that it claimed were necessary to properly evaluate Gatlin's discrimination claim. Following a series of letters and a site visit to the mine, HCC refused to produce (1) Gatlin's personnel file and (2) the personnel files of all other employees at the mine where Gatlin was employed who faced discipline, reprimand, or termination during the previous five years for engaging in the conduct which led to Gatlin's termination.   During the site visit, an MSHA investigator issued two citations and an order to HCC under § 104(a) and (b)[1] of the Mine Act, and HCC contested those citations with the Federal Mine Safety and Health Review Commission ("Commission").   Following a hearing, an ALJ upheld the citations and order, and the Commission affirmed the decision.   On appeal, HCC claims that (1) the MSHA exceeded its authority under the Mine Act by demanding company personnel documents without first identifying any basis for a discrimination claim and (2) the MSHA's demands to inspect the records violated HCC's Fourth Amendment rights.   For the following reasons, we **AFFIRM**.

**I.**

HCC owned and operated the Elk Creek Mine (hereinafter "the Mine") in Madisonville, Kentucky.   Gatlin was terminated from his job as a non-union belt examiner at the Mine on January 8, 2009, after refusing to perform a pre-shift examination that he believed entitled him to

---

[1]The current citation for this section of the Mine Act is 30 U.S.C. § 814.   This opinion refers to each relevant section of the Mine Act by its originally published section number to avoid confusion and maintain continuity with the practical usage of the MSHA.

an extra hour of pay.  HCC's stated reason for terminating Gatlin was "insubordination." On January 20, 2009, Gatlin filed a discrimination complaint against HCC with the MSHA, and an MSHA complaint processor forwarded a copy of the discrimination complaint to HCC. A cover letter attached to the complaint informed HCC that there was an investigator assigned to the case who would contact the company during the fact-finding stage of the investigation. Gatlin's complaint against HCC stated as follows:

> I feel that I was unfairly terminated due to being directed to do more than my regular job duties on a daily basis, which I would do on weekends for extra pay. I also feel that the comment about the union played a part in my being discharged. I would like my job back, any negative comments deleted from my personnel file and backpay for the time I've been off.  I feel that my name has been black balled in the mining industry around here and they will not hire me.

The Commission would later determine that this complaint, standing alone, did not set forth a protected activity for a discrimination claim pursuant to § 105(c) of the Mine Act.[2]  *Secretary of Labor v. Hopkins Cty. Coal, LLC*, 38 FMSHRC 1317, 1318 (June 2016).

However, the day after the complaint was sent to HCC, MSHA Special Investigator Kirby Smith ("Smith") conducted a post-complaint interview of Gatlin and determined that Gatlin may have engaged in a protected activity under the Mine Act.  Specifically, Smith testified that his interview with Gatlin revealed that HCC may have instructed Gatlin to fix, repair, or correct an unsafe condition in the Mine in lieu of recording each potential safety violation.  Gatlin also reported to Smith that his job had become so burdensome that he didn't have sufficient time to correct the unsafe conditions he discovered.  Additionally, Smith believed based on the post-complaint interview that Gatlin may have been reporting an increased number of hazardous conditions to management in his pre-shift and on-shift book.[3]

Following the post-complaint interview, Smith prepared a letter requesting permission from MSHA District Manager Carl Boone ("Boone") to initiate an investigation into Gatlin's case.  Boone approved and signed the letter, which was addressed to HCC General Manager

---

[2]The current statutory citation for the anti-discrimination provision of the Mine Act is 30 U.S.C. § 815(c).

[3]The Commission credited Smith's testimony, stating that Smith "determined that Gatlin may have engaged in protected activity and may have suffered an adverse action."

William Adelman ("Adelman") and requested interviews with five of HCC's management-level employees regarding Gatlin's discrimination complaint.  The letter, dated January 26, 2009, was sent to HCC.  In response, counsel for HCC "refused to arrange the requested interviews unless MSHA identified the protected activity alleged in [Gatlin's] discrimination claim."  *Hopkins Cty. Coal*, 38 FMSHRC at 1319.  MSHA never responded directly to this letter.

On February 23, 2009, Boone sent another letter stating that MSHA was conducting an investigation into Gatlin's discrimination complaint and requested six sets of documents that MSHA determined to be "necessary to properly evaluate the claim."  The request for documents included: (1) a copy of Gatlin's personnel file; (2) any documents showing disciplinary action that was taken against Gatlin by HCC; (3) documents showing any hazards or potentially hazardous conditions at the Mine that were recorded between July 1, 2008 and January 31, 2009; (4) any HCC employee handbook or manual; (5) the personnel files of all employees at the Elk Creek Mine who were disciplined, reprimanded, or terminated during the period of January 1, 2004 – January 20, 2009 for engaging in the conduct which led to Gatlin's termination ("comparators"); and (6) all documents relied on by HCC in its decision to terminate Gatlin.  The letter stated that all documents requested therein should be provided by close of business on March 2, 2009 and noted that a failure to comply with the request would result in the matter being considered for legal action under § 108[4] of the Mine Act.  After the exchange of several letters between Boone and HCC counsel, HCC agreed to produce all the documents requested except for the personnel files of Gatlin and the comparators.

On March 20, 2009, Boone notified HCC that MSHA investigators would arrive at the Mine to conduct a site visit on March 23, 2009.  Boone stated his expectation that the personnel files would be provided to the investigators at that time.  Once again, HCC counsel responded with a letter challenging the MSHA's right to review the personnel files and contended that the company is entitled to know the protected activity underlying Gatlin's discrimination claim as a prerequisite to its duty to produce the requested documents.  MSHA never responded.

---

[4]30 U.S.C. § 818.

On March 23, 2009, Smith and MSHA Investigator Adamson arrived at the Mine and were met by Adelman, the Mine's general manager.  At approximately 8:15 a.m., Smith requested to review the personnel files, and Adelman refused to make them available.  Then, Smith issued a citation to HCC for failing to produce files as required of mine operators ("operators") under § 103(a) and (h) of the Mine Act.[5]  Smith gave Adelman forty-five minutes, until 9:00 a.m., to abate the violation.  After Adelman spoke with HCC counsel, he informed Smith that he did not intend to turn over the personnel files.  Consequently, at 9:00 a.m., Smith issued a withdrawal order under § 104(b) of the Mine Act.  Five minutes later, at 9:05 a.m., Smith issued a final citation for continuing to operate in the face of a withdrawal order.  Because the violation was not abated, HCC became subject to daily civil penalties of up to $5,000 per day pursuant to § 110 of the Mine Act.[6]

On the same day that HCC received two citations and a withdrawal order arising from their refusal to produce the requested personnel files, HCC filed a notice of contest with the Commission.  On March 26, 2009 following a conference between the parties, HCC voluntarily produced Gatlin's personnel file and the redacted personnel files of the comparators, thereby relieving HCC of continuing liability for daily civil fines.

## II.

On June 7, 2011, a hearing was held before an ALJ from the Federal Mine Safety and Health Review Commission.  During those proceedings, HCC contested the validity of the two citations and the withdrawal order issued by MSHA Inspector Smith during his site visit to the Mine.  HCC argued, *inter alia*, that: (1) § 103 of the Mine Act does not authorize the Secretary to request personnel files which are not required to be kept under the Mine Act during the course of discrimination investigations; and (2) the demand for personnel files violated HCC's Fourth

---

[5]The current citation for this section of the Mine Act is 30 U.S.C. § 813.

[6]The current citation for this section of the Mine Act is 30 U.S.C. § 820(b)(1).

Amendment Rights.**7**   The Commission provided the following summary of the ALJ's decision, which upheld the citations and order:

> [The ALJ] rejected HCC's argument that section 103 of the Act does not authorize the Secretary to request personnel files during a discrimination investigation.  He determined that because investigating discrimination claims is a function of the Secretary, information relevant to assessing the merits of those claims is "reasonably required."  The [ALJ] found the Secretary's interpretation of sections 103(a) and (h) reasonable and entitled to deference.  He determined that the requirement in section 103(h) that the information sought be "reasonably required" obligates the Secretary to have a reasonable understanding of the complainant's claim prior to making a document request.  He found that Smith had credibly testified that he had a reasonable understanding of Gatlin's claim before making the request, and rejected HCC's claim that the request was a fishing expedition.**8**

> The [ALJ] rejected HCC's Fourth Amendment challenge on the grounds that under *Donovan v. Dewey*, 452 U.S. 594, 604 (1981), warrantless inspections under the Mine Act are permissible because the mining industry is pervasively regulated, and the certainty and regularity of the Act's inspection scheme provide an adequate substitute for a warrant.  He further stated that the Secretary's interest in promoting miner safety outweighs HCC's general interest in its personnel records.

*Hopkins Cty. Coal*, 38 FMSHRC at 1320.

In a June 24, 2016 opinion, the Commission affirmed the ALJ's decision to uphold the citations and withdrawal order issued by the MSHA.  The Commission held as follows: (1) the Secretary had authority to investigate Gatlin's discrimination claim even though the miner's initiating complaint did not articulate a protected activity; (2) § 103(h) authorizes the Secretary to request certain files that an operator is not legally required to maintain so long as the requested

---

**7**HCC does not raise several arguments that it presented to the ALJ on appeal, and these arguments are thus waived.  *See Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 544 n.8 (6th Cir. 2002) ("It is well established that an issue not raised in a party's briefs on appeal may be deemed waived").

**8**"Investigator Smith testified that by February 6, he had not yet established a protected activity, but based on allegations made by Gatlin in the interview, Smith began looking into the possibility of a protected activity related to determining and reporting safety hazards.  Specifically, Gatlin alleged that as a belt examiner he had been required to perform work beyond his regular job duties, which made his job so burdensome that he did not have enough time to correct the safety hazards he found.  He alleged that as a result, he began citing more hazardous conditions in the pre-shift and on-shift exam books.  Gatlin stated that he had been told that he did not necessarily have to record a hazard if it was corrected" (footnote in original).

records are "reasonably required" to enable him to perform his functions under the Mine Act; (3) the personnel files requested by the Secretary were reasonably required in order to investigate Gatlin's discrimination claim because they tended to prove or disprove a prima facie element of the claim; (4) HCC was not entitled to notice of the protected activity alleged as a prerequisite to the Secretary's right to conduct an investigation or to an operator's duty to comply with the Secretary's investigation; and (5) the Secretary's demand to review the personnel records did not violate HCC's Fourth Amendment Rights because the inspection was reasonable under *Donovan v. Dewey*, 452 U.S. 594 (1981), and the request satisfied the requirements for an administrative subpoena. The Commission therefore affirmed the ALJ, and HCC appealed.

### III.

When presiding over an appeal from a final order of the Commission, "[t]his Court reviews the Commission's decision and not the underlying decision of the ALJ . . . ." *Pendley v. Fed. Mine Safety & Health Review Comm'n*, 601 F.3d 417, 422 (6th Cir. 2010). We apply "a deferential standard to the Commission's factual determinations." *Id.* "The findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." 30 U.S.C. § 816(a)(1). "Substantial evidence is determined by evaluating whether there is such relevant evidence as a reasonable mind might accept as adequate to support the Commission's conclusion." *Pendley*, 601 F.3d at 422–423 (quoting *Nat'l Cement Co. v. Fed. Mine Safety & Health Review Comm'n*, 27 F.3d 526, 530 (11th Cir. 1994)). "Questions of law are reviewed de novo." *N. Fork Coal Corp. v. Fed. Mine Safety & Health Review Comm'n*, 691 F.3d 735, 739 (6th Cir. 2012) (citing *Pendley*, 601 F.3d at 423).

### a. The Secretary's request for personnel files during its investigation of Gatlin's discrimination complaint was authorized under the Mine Act

HCC claims that the Secretary exceeded his authority under the Mine Act by demanding production of employee personnel files without first providing the operator with any factual basis for a prima facie discrimination claim. Three statutory provisions define the disputed scope of the Secretary's power under the Act. First, the Secretary's general authority to conduct investigations under the Mine Act is provided by § 103(a). Second, the Secretary's authority to

request records and other information from operators derives from § 103(h). Third, the Secretary's specific authority to investigate employee discrimination complaints flows from § 105(c)(2). No provision of the Mine Act requires an operator to maintain personnel files.

The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). The "inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Id.* (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989)).

**1. The Secretary did not exceed his authority to investigate a discrimination claim under the Mine Act by requesting the production of company personnel files that were not required to be kept under the Act**

HCC first contends that the Secretary may not demand production of private company personnel files because operators are not required to keep those records under the Mine Act. The Commission rejected this argument, holding that "section 103(h) broadly authorizes the Secretary to request access to personnel records not specifically required to be kept by operators, as long as the records are 'reasonably required' to allow the Secretary to perform his function of investigating complaints of discrimination made pursuant to section 105(c) of the Mine Act." *Hopkins Cty. Coal*, 38 FMSHRC at 1331. HCC does not point to any portion of the statute that limits the scope of the Secretary's right to seek such non-compulsory company records. Further, HCC fails to cite any case law suggesting an alternative reading to the position taken by the Secretary and the Commission.

Rather, § 103(h) states that:

> *[i]n addition to* such records as are specifically required by this chapter, every operator of a coal or other mine *shall establish and maintain such records*, make such reports, and *provide such information*, as the Secretary . . . may reasonably require from time to time to enable him *to perform his functions under this chapter*.

30 U.S.C. § 813(h) (emphasis added). This provision expressly places a duty on operators to provide records, reports, and information to the Secretary during the performance of his "functions" under the Mine Act. Further, the "in addition to" clause in § 103(h) plainly means

that operators are under a duty to provide information to the Secretary *beyond* such records that are expressly required to be kept under the Mine Act. *See Sec'y of Labor v. BHP Copper, Inc.,* 21 FMSHRC 758, 765 (July 1999) ("[n]othing in section 103(a) or any other provision of the Mine Act limits the Secretary's investigative powers to such [required] information"). Therefore, § 103(h) unambiguously grants the Secretary the right to company records "in addition to" those required under the Mine Act so long as the records are "reasonably required" by the Secretary "to perform his functions."[9]

Because it is undisputed that one of the "functions" of the Secretary under the Mine Act is to evaluate and investigate discrimination complaints in accordance with § 105(c)(2), the Secretary did not exceed his authority by demanding personnel files from HCC even though those records were not required to be kept under the statute. *See* 30 U.S.C. § 815(c)(2).

**2. The Secretary did not exceed his authority under the Mine Act by requesting company personnel files merely because he failed to articulate a factual basis for a prima facie claim of discrimination to the mine operator**

The Mine Act requires that, "[n]o person shall discharge or in any manner discriminate against . . . any miner . . . because of the exercise by such miner . . . of any statutory right afforded by [the Act]." 30 U.S.C. § 815(c)(1). A prima facie claim of discrimination under the Mine Act requires (1) a protected activity, and (2) an adverse action that was motivated in any part by the protected activity. *Pendley*, 601 F.3d at 423; *Sec'y of Labor on behalf of Pasula v. Consolidation Coal Co.*, 2 FMSHRC 2786, 2799 (Oct. 1980). Since the beginning of this dispute, HCC has been unwavering in its insistence that "without a protected activity . . . there can be no possibility of any viable discrimination claim." Thus, HCC argues that the Secretary exceeded his authority by demanding personnel files in this case because "at the time th[e] demand was sent, MSHA could not identify whether any protected activity had been alleged." However, even assuming *arguendo* that the MSHA was required to develop a reasonable factual

---

[9]This reading of § 103(h) is consistent with those of our sister circuits. The Seventh Circuit rejected a similar argument to the one raised here by HCC, finding that "section [103](h) unambiguously requires mines to provide MSHA with records, reports, and information beyond what mines are otherwise required to maintain." *Big Ridge, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 715 F.3d 631, 641 (7th Cir. 2013). Similarly, the D.C. Circuit recognized that § 103(h) "contains little limitation on the type of information to be provided." *Energy W. Min. Co. v. Fed. Mine Safety & Health Review Comm'n*, 40 F.3d 457, 461 (D.C. Cir. 1994).

basis for a discrimination claim prior to making a request for documents as part of a discrimination investigation, the MSHA had reason to believe that Gatlin engaged in a protected activity during this particular investigation.   The Commission found as a matter of fact that MSHA Inspector Smith had "determined that Gatlin may have engaged in protected activity and may have suffered adverse action" prior to making the request for personnel files.  *Hopkins Cty. Coal*, 38 FMSHRC at 1318; *see also id.* at 1325.

Because we review factual findings of the Commission under the substantial evidence standard, we must defer to the Commission's finding that Smith believed that Gatlin may have engaged in a protected activity so long as "there is such relevant evidence as a reasonable mind might accept as adequate to support the Commission's conclusion."  *Pendley*, 601 F.3d at 422–423 (quoting *Nat'l Cement Co. v. Fed. Mine Safety & Health Review Comm'n*, 27 F.3d 526, 530 (11th Cir. 1994)).   Here, the record contains evidence that Gatlin may have engaged in the following protected activities prior to his termination: (1) HCC instructed Gatlin to fix, repair, or correct an unsafe condition in the mine in lieu of recording each potential safety violation; (2) Gatlin was so overburdened with job duties in the mine that he didn't have sufficient time to correct the unsafe conditions he discovered; and (3) Gatlin may have been reporting an increased number of hazardous conditions to management in his pre-shift and on-shift book.[10]   Smith's testimony about Gatlin's case is relevant evidence that would allow a reasonable mind to accept the Commission's factual determination.   Thus, we must defer to the Commission's finding that Smith recommended the requests for the personnel files only after he had a reasonable basis for believing that Gatlin engaged in a protected activity under the Mine Act prior to his termination.[11]   Therefore, HCC's argument that there was "no possibility of any viable discrimination claim" is not supported by the record, and the Secretary did not exceed his authority by requesting the personnel files at issue in this case.

---

[10]Furthermore, Gatlin's job as a belt examiner was intimately related to the health and safety of the Mine. *See, e.g.*, Requirements for Belt Examiner, 805 Ky. Admin. Regs. 7:100 (Kentucky mine regulation requiring safety training and a written examination in order to become a belt examiner).

[11]We make no holding in regard to whether, or to what extent, the Secretary is required by the Mine Act to develop a reasonable factual basis for believing that a protected activity may have occurred prior to requesting documents from an operator under § 103(h) of the Mine Act.

Despite the factual findings of the Commission, HCC argues that the Secretary nonetheless exceeded his authority because "the Government has a burden to articulate a reasonable basis" for a record demand under § 103(h) "in the absence of a cognizable discrimination claim under the Mine Act." However, as stated, there was a cognizable discrimination claim in this case, and the facts presented here could not be applied to support HCC's own legal theory. HCC essentially asks this Court to apply a pleading standard to a miner's initiating complaint with the Commission. However, there is no language in the Mine Act or case law that would support placing a pleading burden on the Secretary to justify record requests under § 103(h) to mine operators as a prerequisite to his statutory right to request and obtain certain documents pursuant to a discrimination investigation. Rather, even a *post-investigation* discrimination complaint formally filed with the Commission is held to a "minimal" pleading standard and need not substantiate a prima facie case. *See* 29 C.F.R. § 2700.42 ("[a] discrimination complaint shall include a short and plain statement of the facts, setting forth the alleged discharge, discrimination or interference, and a statement of the relief requested"); *see also Perry v. Phelps Dodge Morenci, Inc.*, 18 FMSHRC 1918, 1921 (Nov. 1996) (complainant under Mine Act is not obligated "to begin proving his prima facie case" but is "simply obligated to meet the Commission's minimal pleading requirements"). In light of the "minimal" pleading requirements of formal, *post-investigation* complaints filed with the Commission, it would be inconsistent with the statutory scheme to adopt HCC's interpretation and require the Secretary to articulate a factual basis for a prima facie claim to a mine operator at the *pre-investigation* stage as a prerequisite to making record requests under § 103(h). *See* 29 C.F.R. § 2700.40(a).

Despite refusing to divulge a specific protected activity to the operator at the pre-investigation stage, the Secretary complied with his duty under the Mine Act to notify HCC about Gatlin's discrimination complaint when the MSHA forwarded a copy of Gatlin's complaint to HCC with a cover letter that notified HCC that an investigator had been assigned to the case. *See* 30 U.S.C. § 815(c)(2). HCC's argument is therefore without merit under these facts.

**3. The requested personnel files were "reasonably required" by the Secretary in order to investigate Gatlin's discrimination complaint**

The proper question when analyzing whether the Secretary exceeded his authority to request documents under § 103(h) of the Mine Act is whether the record request was "reasonably required" by the Secretary in order to perform his functions. The Mine Act provides that "every operator of a coal or other mine shall . . . make such reports, and provide such information, as the Secretary . . . may *reasonably require* from time to time to enable him to perform his functions under [the Mine Act]." 30 U.S.C. § 813(h) (emphasis added). Here, the Commission held that the requested personnel files were reasonably required by the Secretary because "records that tend to establish or disprove an element of a prima facie case of discrimination generally are . . . reasonably required to enable the Secretary to perform his investigative function under section 105(c) of the Mine Act." *Hopkins Cty. Coal*, 38 FMSHRC at 1329. HCC challenges the Secretary's authority to request the personnel files on the basis that they were not "reasonably required" because they were not relevant and that the requests were part of an overbroad and sweeping records demand.

HCC states that the personnel files "would not have shed any light on MSHA's quest to uncover some unalleged protected activity upon which to manufacture a new claim for Gatlin." Regarding Gatlin's personnel file, the Commission found that it was relevant, citing Smith's testimony that Gatlin's work history, prior workplace discipline, and other information contained in the personnel files would be relevant to corroborate or disprove Gatlin's discrimination claim. *Id.* This conclusion is sound because a claimant's own personnel file can tend to prove or disprove the credibility of a discrimination claim. *See, e.g.*, *Ross v. William Beaumont Hosp.*, 678 F. Supp. 655, 661 n.12 (E.D. Mich. 1988) (plaintiff's own personnel file used to prove that her misconduct, not discrimination by the employer, was the reason for her termination).

With respect to the files of the comparators, the Commission found that these documents were "critical aids" in determining disparate treatment. *Hopkins Cty. Coal*, 38 FMSHRC at 1329. Indeed, disparate treatment is one of the commonly-used methods for proving a causal connection between a protected activity and an adverse action under the Mine Act. *See Cumberland River Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 712 F.3d 311, 318

(6th Cir. 2013). If the comparator files revealed that HCC had disciplined other employees who engaged in the same conduct as Gatlin, but were not terminated, or were otherwise treated more leniently, the Secretary would have indirect evidence of causation to support a discrimination claim. *See Hollins v. Atl. Co.*, 188 F.3d 652, 660 (6th Cir. 1999).

Further, obtaining personnel files to prove certain elements of discrimination is both common and relevant under a variety of legal theories. *E.g.*, *Parrish v. Ford Motor Co.*, 953 F.2d 1384 (6th Cir. 1992) (table) ("access to the personnel files of the eight individuals promoted . . . in order to discover at a minimum their ages and qualifications, is clearly necessary for [claimant] to establish a prima facie case of discrimination"); *Savage v. City of Lewisburg, Tenn.*, No. 1:10-0120, 2014 WL 4979308, at *7 (M.D. Tenn. Oct. 6, 2014) (personnel file of co-worker who also reported sex discrimination at least reasonably likely to yield relevant evidence); *E.E.O.C. v. Avco New Idea Div.*, 26 Fed. R. Serv. 2d 736, *4 (N.D. Ohio 1978) (supervisors' personnel files "might reasonably be expected to yield probative evidence of plaintiff's claims"). Therefore, the personnel files requested by the MSHA were relevant to the Secretary's investigation of Gatlin's discrimination complaint.

From the beginning of this litigation, HCC has argued that the MSHA was engaged in a "fishing expedition" and that the requests were "sweeping records demands" that give MSHA field investigators "unfettered discretion" to obtain access to a virtually unlimited array of internal company documents. However, this assertion is not supported by the record. The six record requests were limited in time frame and scope, based on information learned by the MSHA from Gatlin's initial complaint or its post-complaint interview of Gatlin, and were all related to either the prima facie elements of a discrimination claim under the Mine Act or the credibility of Gatlin's allegations. Additionally, the request to obtain personnel files was only made after the MSHA was denied the right to interview five of HCC's managerial employees who may have had knowledge of the circumstances surrounding Gatlin's termination. The Commission also found that it only took HCC "a few hours" to produce the requested personnel files. *Hopkins Cty. Coal*, 38 FMSHRC at 1329. Furthermore, the requests were not made on site at the whim of a field investigator, and the record indicates that Smith was required to get approval from district manager Boone prior to making the record demands in question. Thus, the

record does not support HCC's claim that the MSHA's request for personnel files was overly broad or left unfettered discretion to investigators.

Given that the Secretary ultimately declined to file a formal complaint against HCC following its investigation, HCC may very well be correct in its assertion that Gatlin did not engage in a protected activity or have a valid discrimination claim. However, the question in this case was never whether Gatlin's discrimination claim had sufficient merit to warrant the Secretary's filing of a complaint with the Commission. Rather, the question is whether or not the requested personnel files were reasonably required by the Secretary in order to *investigate* whether Gatlin's claim *could have* sufficient merit to file a complaint on his behalf with the Commission. *See Sec'y of Labor v. Pontiki Coal Corp.*, 19 FMSHRC 1009, 1017, (June 1997) ("it is the scope of the Secretary's *investigation*, rather than the initiating complaint, that governs the permissible ambit of the complaint filed with the Commission"). Here, the Secretary's requests for certain HCC personnel files were reasonably required in order to investigate the merits and credibility of Gatlin's discrimination complaint under the Mine Act.

### b. The Secretary's request for personnel files under § 103(h) of the Mine Act did not violate HCC's Fourth Amendment rights

Under the Fourth Amendment, "[t]he businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978). "However, unlike searches of private homes, which generally must be conducted pursuant to a warrant in order to be reasonable under the Fourth Amendment, legislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment." *Donovan*, 452 U.S. at 598. Fourth Amendment jurisprudence recognizes an exception that dispenses the warrant requirement "in cases involving 'closely regulated' industries, where . . . the commercial operator's privacy interest is adequately protected by detailed regulatory schemes authorizing warrantless inspections." *N.Y. v. Burger*, 482 U.S. 691, 719 (1987); *see, e.g., Donovan v. Dewey*, 452 U.S. 594 (1981) (coal mining); *United States v. Biswell*, 406 U.S. 311 (1972) (firearms); *Colonnade Catering Corp. v. United States*, 397 U.S. 72 (1970) (liquor); *United States v. Acklen*, 690 F.2d 70 (6th Cir. 1982) (pharmacies). It is well-

established that coal mining is a pervasively regulated industry, and that the "owner of such a facility cannot help but be aware that he 'will be subject to effective inspection.'" *Donovan*, 452 U.S. at 603 (quoting *Biswell*, 406 U.S. at 316); *see Burger*, 482 U.S. at 719; *see also United States v. Blue Diamond Coal Co.*, 667 F.2d 510, 520 (6th Cir. 1981).

The Commission rejected HCC's argument that the MSHA requests to inspect company personnel files violated its Fourth Amendment rights, holding *inter alia* that the inspection by the MSHA was reasonable under *Donovan*. *Hopkins Cty. Coal*, 38 FMSHRC at 1332. In *Donovan*, the Supreme Court upheld regular safety inspections under § 103(a) of the Mine Act despite the fact that the search at issue was conducted without a warrant. *Donovan*, 452 U.S. at 605.

The issue presented here is whether the Secretary's warrantless request to inspect certain HCC company personnel files as part of a discrimination investigation pursuant to § 105(c)(2) was reasonable under the Fourth Amendment. In order for the warrantless inspection of a pervasively regulated industry to be reasonable, three criteria must be met: (1) there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made; (2) the warrantless inspections must be necessary to further the regulatory scheme; and (3) the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant. *Burger*, 482 U.S. at 702–03.

Just as in *Donovan*, the substantial government interest underlying the Mine Act is "improving the health and safety conditions in the Nation's . . . mines. In enacting the statute, Congress was plainly aware that the mining industry is among the most hazardous in the country and that the poor health and safety record of this industry has significant deleterious effects on interstate commerce." *Donovan*, 452 U.S. at 602. HCC argues that MSHA investigations into discrimination complaints are "not related to health and safety," and suggests that "the reason for the mining industry's pervasive regulation is not because of a long history of inherent problems with discrimination." This argument ignores the critical fact that the Mine Act's anti-discrimination provision is instrumental in ensuring safe and healthy conditions in our nation's mines. This Court has previously stated that an important feature of the Mine Act is to prevent "reprisal for making safety-related complaints," and recognized that Congress included the anti-

discrimination provision "to encourage miners to play an 'active part in the enforcement of the Act' and protect them 'against any possible discrimination which they might suffer as a result of their participation.'" *N. Fork*, 691 F.3d at 738 (quoting S.Rep. No. 95–181, at 35 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3401, 3435). Discrimination against any miner who reports safety-related issues is a threat to the safety of all miners, and HCC incorrectly dissociates discrimination from health and safety. Accordingly, we find that the same government interest supporting the warrantless safety inspections at issue in *Donovan* guides the MSHA's efforts to investigate instances of discrimination under § 105(c)(2).

Next, we ask whether warrantless inspections of company documents during the course of discrimination investigations are necessary to further the regulatory scheme. The Secretary's general authority to conduct investigations arises under § 103(a). This section explicitly provides that, "[f]or the purpose of making *any* inspection *or investigation* under this [Act], the Secretary . . . with respect to fulfilling his responsibilities under this [Act], or any authorized representative of the Secretary . . . shall have a right of entry to, upon, or through any coal or other mine." 30 U.S.C. § 813(a) (emphasis added). Further, the Senate Report is persuasive to support the position that warrantless entry under § 103(a) was intended to apply equally to both inspections and investigations under the Act by stating that, "[t]he Committee intends to grant a broad right-of-entry to the Secretaries or their authorized representatives to make inspections *and investigations* of all mines under this Act without first obtaining a warrant." S.Rep. No. 95–181, at 27 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3401, 3427 (emphasis added). The Senate Report further states that, "a warrant requirement would seriously undercut this Act's objectives" because "many safety or health hazards may be concealed if advance warning of inspection is obtained." *Id.*; *see also Donovan*, 452 U.S. at 603. Thus, § 103(a) intended to permit warrantless right-of-entry to the Secretary for the purpose of both inspection and investigation, including the discrimination investigation undertaken by the Secretary in this case pursuant to § 105(c)(2). Warrantless discrimination investigations, just like the regular inspections at issue in *Donovan*, are therefore necessary to the enforcement of the regulatory scheme. *See Donovan*, 452 U.S. at 603–604.

Finally, we ask whether "the statute's inspection program, in terms of the certainty and regularity of its application," provides a constitutionally adequate substitute for a warrant. *Burger*, 482 U.S. at 703. In order to comply with this standard, the statute "must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *Id.*; *see also Biswell*, 406 U.S. at 315 ("[i]n the context of a regulatory inspection system of business premises that is carefully limited in time, place, and scope, the legality of the search depends not on consent but on the authority of a valid statute"). *Donovan* already confirmed that § 103(a) comports with the Fourth Amendment, and that "the Act establishes a predictable and guided federal regulatory presence." *Donovan*, 452 U.S. at 604. The anti-discrimination provision of the Mine Act additionally defines the scope of the investigation and limits the discretion of inspecting officers because it requires that a copy of the complaint be forwarded to the owner of the commercial premises. 30 U.S.C. § 815(c)(2).

In this case, the MSHA forwarded a copy of Gatlin's discrimination complaint to HCC. Further, the MSHA disclosed in a cover letter the provision of the Mine Act under which the investigation was authorized, § 105(c), and the MSHA provided two advanced notifications of the date investigators would conduct a site visit. On the date of the site visit, the initial citation for failure to provide the records stated that the request was being made pursuant to the law and specifically noted the authority of the MSHA under § 103(a) and (h) to investigate and to obtain information from HCC. Altogether, these sufficiently placed HCC on notice that the search was requested pursuant to law and limited the scope of the search to investigating a specific discrimination complaint.

Additionally, HCC's argument that the MSHA field investigators had "unbridled discretion" to request and obtain documents is not supported by the record. Prior to making any requests under § 103(h), MSHA Investigator Smith sought the approval and signature of MSHA District Manager Boone. This shows that the search at issue in this case was not made at the "unbridled discretion" of an agent in the field, as HCC claims. Rather, the document request came after a deliberative internal process within the agency, and the request notified HCC of the

individual whose complaint was being investigated and the specific information and documentation that was being sought as part of that specific discrimination investigation.

Furthermore, as *Donovan* determined, "the Act provides a specific mechanism for accommodating any special privacy concerns that a specific mine operator might have" and the discretion of government officials is "directly curtailed by the regulatory scheme." *Donovan*, 452 U.S. at 604–605. For example, in the context of the citations issued by the MSHA for HCC's failure to comply with the document requests in this case, "the Secretary's penalty assessments bec[a]me final and payable only after full review by both the Commission and the appropriate court of appeals." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 218 (1994) (citing 30 U.S.C. §§ 820(i) and 816). Thus, HCC's initial refusal to comply with the document requests did not require it to pay the fines until after HCC was afforded multiple opportunities to review the legality of the document requests made by the MSHA. Therefore, the warrantless document requests made in this case pursuant to § 103(h) sufficiently limited the discretion of the field officer seeking to conduct the inspection of the records and provided a constitutionally adequate substitute for a warrant. The search was thus reasonable under the Fourth Amendment.

To be clear, we do not hold that mine operators must blindly comply with every administrative request to inspect private company records, no matter how hobbled the operator is in determining the legal validity of the request. Nor do we hold that every request for private company documents by the MSHA comports with the Fourth Amendment merely because a vague discrimination complaint was filed by a miner. However, in the circumstances presented here, HCC had sufficient information to assess the legality of the document requests at issue. HCC had ample advance notice of precisely which records the MSHA would inspect, it knew the date, time, and location of the requested inspection, it knew the specific identity of the complaining miner, and it knew that the discrimination investigation would seek to determine whether that miner engaged in a safety-related protected activity because the complaint was filed pursuant to the Mine Act—even though HCC did not know what the specific safety-related protected activity was. This is roughly equivalent to what HCC could have learned through notice of the contents of Gatlin's post-complaint interview with the MSHA. While there is no apparent reason for MSHA to refuse to give HCC some indication of the interview's gloss on the

miner s written complaint, in this case that failure was not a sufficient justification for refusing to comply with the request.

HCC's Fourth Amendment argument relies primarily on this Court's decision in *Kings Island*. There, we held that "[a]n employer may not be threatened with a penalty for asserting his Fourth Amendment rights." *McLaughlin v. Kings Island, Div. of Taft Broad. Co.*, 849 F.2d 990, 997 (6th Cir. 1988). *Kings Island* invalidated an OSHA regulation that presumptively allowed OSHA field investigators to demand and inspect records without a warrant or an administrative subpoena. *Id.* However, the holding in *Kings Island* was premised on the fact that no Fourth Amendment exception to the warrant requirement existed in that case, and the court specifically recognized that coal mining is such a pervasively regulated industry that it does fit into an exception. *Id.* at 995 (citing *United States v. Blue Diamond Coal Co.*, 667 F.2d 510 (6th Cir. 1981)). Additionally, the reviewing commission in *Kings Island* held that coal mining cases were inapplicable to its Fourth Amendment analysis. The OSHA Review Commission stated that, "the Supreme Court has clearly indicated that cases under this separate and distinct branch of the Fourth Amendment case law (pervasively regulated industries) have little relevance to OSHA Act inspection issues." *Sec'y of Labor v. Kings Island, Div. of Taft Broad. Co.*, No. 82-1016, 1987 WL 89084, at *6 (O.S.H.R.C.) (citing *Barlow's, Inc.*, 436 U.S. at 313–14 and *Donovan*, 452 U.S. at 599–605)). Because the inspection at issue in *Kings Island* did not involve a pervasively regulated industry, the holding in *Kings Island* is inapplicable.

To the extent that HCC is arguing that the rationale in our *Kings Island* decision might be extended to cases involving the coal industry under certain, limited circumstances, this case is factually distinguishable from *Kings Island*. There, an OSHA investigator entered a theme park without prior warning to investigate an employee health complaint alleging that the use of fog during theatrical performances caused irritation to the employees' eyes and upper respiratory systems. *Kings Island*, 849 F.2d at 991–92. During the inspection, the OSHA investigator, without any other purpose than to investigate the complaint about the fog, demanded to inspect three years of records relating to all reportable occupational injuries and illnesses at the facility. *Id.* at 992. The stated purpose for inspecting these records was to conduct a general search into any hygienic and environmental problems at the theme park. *Id.* This Court summarized the

incident as "an unannounced inspection accompanied by an arbitrary and discretionary demand to inspect company records not only as they relate to a specific complaint, but for hygienic and environmental problems in general." *Id.* at 995.

This case contains none of the aggravating factors present in *Kings Island*. First, the MSHA inspection on March 23, 2009 was anything but unannounced. Three months prior to the site visit, on January 20, 2009, the MSHA sent HCC a notification that a discrimination complaint had been filed by Gatlin. Thereafter, MSHA district manager Boone and HCC exchanged eight letters, two of which provided specific notification to HCC that MSHA investigators would be arriving at the Mine on March 23, 2009 to investigate Gatlin's complaint. Second, the demands to inspect company records were not arbitrary or discretionary. Prior to making the record demands, Smith forwarded his investigatory findings to Boone. Boone then signed and sent the requests to HCC, and no additional requests for records were made. Third, each of the requests related to specific facts and allegations brought to Smith's attention in his complaint and during his interview with Gatlin, and therefore did not expand from the complaint at issue into an entirely new field of investigation without any institutional check on the authority of the field investigator, as was the case in *Kings Island*. Therefore, even if *Kings Island* were applicable to the analysis here, this case is distinguishable because the record requests by the MSHA were (1) announced well in advance, (2) not arbitrary, (3) not left to the complete discretion of the field investigator, and (4) not extended beyond the scope of investigating Gatlin's claims.

Accordingly, we hold that the § 103(h) requests in this case were sufficiently limited in time, place, and scope as part of the Mine Act's regulatory inspection system for conducting discrimination investigations and did not violate HCC's Fourth Amendment rights. *See Biswell*, 406 U.S. at 315.

## IV.

For the foregoing reasons, we **AFFIRM** the decision of the Commission and hold that the Secretary's request for personnel files as part of his discrimination investigation was authorized by the Mine Act and did not violate HCC's Fourth Amendment rights.

---

**DISSENT**

---

KETHLEDGE, Circuit Judge, dissenting. The question here is whether MSHA has authority to investigate a miner's complaint when the complaint fails to allege discrimination in violation of the Mine Act. The Act provides that a miner who thinks his employer has discriminated against him in violation of the Act may file a complaint "alleging such discrimination." 30 U.S.C. § 815(c)(2). "Upon receipt of such complaint," MSHA "shall" then "cause such investigation to be made as [it] deems appropriate." *Id.* Here, an MSHA complaint-processor took down Gatlin's story and then reduced it to a written complaint. Yet, as the Commission itself found, Gatlin's complaint still did not allege any discrimination in violation of the Act. *See Sec'y of Labor v. Hopkins Cty. Coal, LLC*, 38 FMSHRC 1317, 1318 (June 2016). MSHA therefore lacked any basis to require Hopkins to produce its personnel records.

Moreover, when MSHA does receive a complaint alleging discrimination in violation of the Act, the Act requires MSHA to forward a copy of that complaint to the respondent. 30 U.S.C. § 815(c)(2). This requirement's manifest purpose is to provide the operator with notice of its alleged violation of the Act before MSHA begins engaging in conduct that resembles a Fourth Amendment search. Absent such notice, an operator is hard-pressed to determine whether a request for documents by MSHA is lawful under the Act.

Hopkins had no such notice here, which left it to guess whether MSHA's request for volumes of its records was lawful. And a wrong guess would expose Hopkins to fines of up to $5,000 per day. *See* 30 U.S.C. §§ 814, 820. I therefore agree with the dissenting commissioners that, "[w]hen there is not even a claim of protected activity or adverse action based on protected activity by the miner or MSHA, a request for five years of personnel records is a fishing expedition not authorized by the statute as a reasonable request." *Hopkins Cty. Coal, LLC*, 38 FMSHRC at 1347.

I respectfully dissent.